IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA
WHEELING DIVISION

**SCOTT SONDA and
BRIAN CORWIN**

*Plaintiffs,*

VS.

CIVIL ACTION NO. **5:22-cv-124 (Bailey)**

HON.

COMPLAINT

**JAMES C. JUSTICE, II
GOVERNOR OF THE STATE
OF WEST VIRGINIA**

*Defendant.*

> ELECTRONICALLY
> FILED
> May 13 2022
> U.S. DISTRICT COURT
> Northern District of WV

## INTRODUCTORY STATEMENT

1. Property ownership and property rights generally are a vitally important part of the American tradition since before its inception as an independent nation; dating back to John Locke's treatises of government in which he refers to life, liberty, and property as being fundamental rights in the nature of law; which are widely believed to be the template for language in the Declaration of Independence and U.S. Constitution.

2. Protection of an individual's property is mentioned twice in the U.S. Constitution, once in the Bill of Rights via the Fifth Amendment "No person shall […] be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." And then again in the Fourteenth Amendment, where is states "…nor shall any State deprive any person of life, liberty, or property, without due process of law;"

3. The importance of real property ownership in particular is expressed colloquially in our culture on a frequent basis. The following quotes illustrate that point:

   o "The wise young man or wage earner of today invests his money in real estate."

      -Attributed to **Andrew Carnegie**

   o "Buy land, they're not making it anymore." Attributed to **Mark Twain**

   o **"**The best investment on earth is earth." Attributed to **Louis Glickman**

4. Individual property rights, in this matter, are highlighted with respect to oil and gas in particular.

5. Energy generation has historically been essential to regional and national economic growth in the United States; and oil and gas plays an important role in that.

6. However, most individuals do not have the means to extract natural resources, including oil and gas, from the ground on their own. Therefore, property owners must rely on companies who have the knowledge, experience, money, and general wherewithal to extract those resources and place them into the stream of commerce.

7. Any time companies need to enter onto and/or into lands held by other individuals, it is vitally important that the Constitutional protections regarding property, as stated above and otherwise at the state level, are adhered to.

8. Since companies are involved in oil/gas extraction, the provisions above tend to dove-tail with protections with respect to Antitrust provisions. In his 1901 address to Congress, then President Theodore Roosevelt spoke directly to this, when he stated:

   o "Great corporations exist only because they are created and safeguarded by our institutions, [therefore, it is] our right and our duty to see that they work in harmony with these institutions." He goes on to say "There is a widespread conviction in the

minds of the American people that the great corporations known as trusts are in certain of their features and tendencies hurtful to the general welfare, […] This springs from no spirit of envy or uncharitableness [sic], nor lack of pride in the great industrial achievements that have placed this country at the head of the nation's struggling for commercial supremacy. It does not rest upon a lack of intelligent appreciation of the necessity of meeting changing and changed conditions of trade with new methods, nor upon ignorance of the fact that combination of capital in the effort to accomplish great things is necessary when the world's progress demands that great things be done. It is [rather] based upon sincere conviction that combination and concentration should be, not prohibited, but supervised and within reasonable limits controlled; and in my judgment this conviction is right."[1]

"It is no limitation upon property rights or freedom of contract to require that when men receive from government the privilege of doing business under corporate form, which frees them from individual responsibility, and enables them to call into their enterprises the capital of the public, they shall do so upon absolutely truthful representations as to the value of the property in which the capital is to be invested. Corporations engaged in interstate commerce should be regulated if they are found to exercise a license working to the public injury. It should be as much the aim of those who seek for social betterment to rid the business world of crimes of cunning as to rid the entire body politic of crimes of violence."[1]

9.  West Virginia Senate Bill 694 (hereinafter "SB 694") may in fact be noble in its origins; however, the language contained in SB 694 in operation is antithetical to those protections of individual property rights, and from the behaviors the Antitrust Laws were designed to protect against, as illustrated by President Theodore Roosevelt's quote above. **[See Exhibit A for full text of SB 694]**

10. Therefore, Plaintiffs in this action seek declaratory and injunctive relief from this Honorable Court to keep SB 694 from either going into effect, or in the alternative, being enforced, in order to protect Plaintiffs' statutorily and constitutionally guaranteed rights.

---

[1] https://www.presidency.ucsb.edu/documents/first-annual-message-16

## PARTIES

11. Plaintiff, Scott Sonda (hereinafter "Sonda"), is an individual Executive Interest Owner underlying multiple tracts of land, both leased and unleased, residing at 1367 Grimes Ridge Road, Bethany, Brooke County, West Virginia, 26032.

12. Plaintiff, Brian Corwin (hereinafter "Corwin"), is an individual Executive Interest Owner underlying multiple tracts of land, both leased and unleased, residing at 1824 West Liberty Road, Bethany, Brooke County, West Virginia, 26032.

13. Defendant James C. Justice, II is the current Governor of the State of West Virginia who—according to Article 7, Section 5 of the West Virginia Constitution—holds Chief Executive Power, and shall take care that the laws be faithfully executed.

## JURISDICTION AND VENUE

11. This action arises, in part, under the United States Constitution, and 15 U.S.C. §1 et seq.

12. This Honorable Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C §§1331 because the matters in controversy arise under laws of the United States, and because this suit seeks redress for the deprivation, under color of state law, for rights secured by the United States Constitution.

13. Further, this Honorable Court has jurisdiction under 15 U.S.C.§ 4, which states, in part, "The several district courts of the United States are invested with jurisdiction to prevent and restrain violations of sections 1 to 7 of this title;"

14. Venue is proper in the Wheeling Division of the Northern District of West Virginia under 28 U.S.C. §1391 (b)(2) because a substantial part of property that is the subject of the action is situated in Brooke County, West Virginia and Ohio County, West Virginia, which are within

the boundaries of the Wheeling Division of the Northern District of West Virginia.

15. This Honorable Court has authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Federal Rules of Civil Procedure 57 and 65 and 28 U.S.C. §2201 and 2202.

16. This Honorable Court has personal jurisdiction over the Defendants because West Virginia is the location of their denial of Plaintiffs' rights under the United States Constitution and the laws of the United States.

## FACTUAL ALLEGATIONS

17. Plaintiffs incorporate the foregoing paragraphs as though fully set forth herein.

18. On February 21, 2022 SB 694 was introduced into the West Virginia Legislature during its normal legislative session 2022, in the Senate Finance Committee.

19. Article 6, Section 28 of the West Virginia Constitution states "No bill shall become law until it has been fully and distinctly read, on three different days, in each house, unless in case of urgency, by a vote of four fifths of the members present, taken by yeas and nays on each bill, this rule be dispensed with: *Provided*, In all cases, that an engrossed bill shall be fully and distinctly read in each house."

20. SB 694, upon introduction, was read for the first time on February 24, 2022. SB 694 was then read for a second time on February 25, 2022, which was then followed by a vote to suspend the West Virginia Constitutional Provision—stated in the immediately proceeding paragraph—to have the third reading occur on the same date, February 25, 2022; that vote passed and the third reading was held on the same day as the second reading.

21. On the same day as the second and third reading, SB 694 was voted on by the Senate and passed, then moved to the West Virginia House.

22. SB 694 was introduced into the WV House on March 1, 2022. After an Amendment process, the WV House passed SB 694 on March 9, 2022; at which time it was sent back to the WV Senate for concurrence on the WV House Amendment, which did also pass the WV Senate on March 9, 2022.

23. SB 694, after passage in both the WV House and WV Senate in agreed upon terms, was then sent to the Office of the Governor of West Virginia on March 15, 2022.

24. West Virginia Governor James C. Justice, II signed SB 694 on March 30, 2022 to be effective 90-days from passage, on June 7, 2022.

[source:

http://www.wvlegislature.gov/Bill_Status/bills_history.cfm?INPUT=694&year=2022&session type=RS]

## **CLAIMS FOR RELIEF**

## **COUNT I – Violation of U.S. Constitution's Fifth Amendment Protection Against the Taking of Private Property Without Just Compensation**

25. Plaintiffs incorporate the foregoing paragraphs as though fully set forth herein.

26. SB 694, Section 22C-9-7a (c)(5) entitled *applicability*, states:

   o "If the applicant meets all of the provisions of this subsection, the commission ***shall*** authorize unitization of tracts, or portions of the tracts, as to all interests in oil and gas in the target formation acreage proposed to be unitized for horizontal drilling, including interests of unknown and unlocatable interest owners, for production of oil and gas from the target formation as a horizontal well unit, and shall issue a horizontal well unit order in accordance with this section." [emphasis added].

27. Furthermore, SB 694 §22C-9-7a (c)(2)(C) (i-iii) states "Before filing an application under this section, an applicant must have:

   o "(i) Made good faith offers to consent or agree to development, and has negotiated in good faith with, all known and locatable royalty owners having executory interests in the oil and gas in the target formation within the acreage to be included in the proposed horizontal well unit who have not previously consented or agreed to the development of the interests and whose interests are not subject to development under §37B-1-1, et

seq. of this code; and

(ii) Made good faith offers to participate or consent or agree to the proposed horizontal well unit, and has negotiated in good faith with, all known and locatable operators who have not previously agreed to participate or consent or agree to development of the acreage to be included in a proposed horizontal well unit.

(iii) A person who satisfies the conditions of paragraphs (A) through (C) of this subdivision is referred to in this section as a person that controls the horizontal well unit."

28. SB 694 §22C-9-7a (d) entitled *application requirements*, (1)(K) states:

  o "A certification that the applicant meets the requirements of subsection (c) of this section with respect to the proposed horizontal well unit, a list of the instruments granting the control and a certification that the applicant has mailed a copy of the application to all known and locatable interested parties by United States certified mail, return receipt requested, to their last known address and to the most current address filed with the West Virginia Department of Environmental Protection, Office of Oil and Gas, if any…."

29. SB 694 §§§22C-9-7a (c)(5) and (c)(2)(C)(i-iii) and (d)(1)(K) taken together indicates that it is the applicant who certifies whether it meets all application requirements, including a definition of "good faith", since it is not defined by this SB 694.

30. Therefore, if the applicant itself determines whether it meets the requisite criteria, and the Commission SHALL authorize unitization of tracts, per SB 694 §22C-9-7a(c)(5), there is no recourse for said outstanding 25% of executory interest owners in a given unit and/or 45% of Operators in a given unit (depending upon the circumstances). Since the Commission SHALL authorize, then the state is authorizing, by statute, the taking of property without just compensation.

31. Further, if SB 694 provides that compensation for said taking is defined by the applicant (i.e. the Operators) themselves, then the compensation cannot be determined to be just by any reasonable measure since the definition of what that means is created by the very individual and/or entity doing the taking; ergo such a taking violates the U.S. Constitution's Fifth

Amendment protection against the taking of property without just compensation.

32. SB 694 §22C-9-7a(f)(14) exemplifies another instance in which it, by its construction, encourages a taking which violates the U.S. Constitution's Fifth Amendment protection against the taking of property without just compensation.

33. SB 694 §22C-9-7a(f)(14) states, in part:

  o "If an operator has not drilled and completed a horizontal well unit formed by the commission within three years after the latter of either the drilling and completion of the initial horizontal well in the horizontal unit or the drilling and completion of the most recent horizontal well within the horizontal well unit, as the case may be, an interested party may file a request to modify the horizontal well unit, and the commission may modify the horizontal well unit…."

34. The wording of this section implies that an operator can apply for a permit for a horizontal well, be approved, and then not drill a well within the boundaries of the established unit for 3 years; but be able to use that 3-year period as a means of holding those with executory interest into the secondary term of their lease (i.e. beyond the length of the primary term) with no further payment of any kind; which, as previously stated, violates the U.S. Constitution's Fifth Amendment protection against the taking of property without just compensation.

**COUNT II – Violation of the U.S. Constitution's Fifth and Fourteenth Amendment Protections Against the State Depriving Any Person of Property Without Due Process of Law**

35. Plaintiffs incorporate the foregoing paragraphs as though fully set forth herein.

36. In addition to violating the U.S. Constitution's Fifth Amendment protections against taking of property without just compensation, the Statute violates the U.S. Constitution's Fifth and Fourteenth Amendment protections against the State taking of property without due process of law.

37. Within the plain language of the Statute in question, as illustrated above, an executory interest

owner has no legal recourse or remedy with respect to the creation of and inclusion in a horizontal unit. Although a hearing may be had—within the plain language of the statute—the Commission has no ability to provide any remedy whatsoever, for the statute requires that the commission SHALL provide approval of the unit if the applicant meets all of the specifications, which the applicant itself certifies that it does indeed satisfy all requirements.

38. The only instance in which the Commission has the authority to decline to issue a horizontal well unit order is if it finds the requirements of subsection (c) of SB 694 §22C-9-7a have not been met. **[See SB 694 §22C-9-7a (e)(3)].**

39. Despite SB 694 providing procedural steps for holding hearings and outlining a "standard of review" for the Commission, the steps simply reaffirm the requirements of SB 694 subsection (c), such that it reiterates the only way in which the Commission may reject an application is if it does not meet the requirements of subsection (c); but if those requirements are met, the Commission <u>shall</u> approve it without any authority for recourse or redress to confront issues that may not be covered by subsection (c) but can otherwise cause harm to individuals in this State based on violations of state and/or federal constitutional, statutory, common law, and/or regulatory provisions, and/or any and all other actions that run afoul of the law. **[See SB 694 §22C-9-7a (e).**

40. Furthermore, in the event the appropriate appellate tribunal as outlined by W. Va. Code §22C-9-11, which references W. Va. Code §29A-5-4, does find violations in the Commission's approval of a horizonal unit application, the tribunal's authority is limited according to W. Va. Code §29A-5-4(g), which states as follows:

  o "(g) The court may affirm the order or decision of the agency or remand the case for further proceedings. It shall reverse, vacate, or modify the order or decision of the agency if the substantial rights of the petitioner or petitioners have been prejudiced because the administrative findings, inferences, conclusions, decision, or order are:

(1) In violation of constitutional or statutory provisions;

(2) In excess of the statutory authority or jurisdiction of the agency;

(3) Made upon unlawful procedures;

(4) Affected by other error of law;

(5) Clearly wrong in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

(h) The judgment of the circuit court or the Intermediate Court of Appeals, whichever is applicable, shall be final unless reversed, vacated, or modified on appeal to the Supreme Court of Appeals of this state in accordance with the provisions of §29A-6-1 of this code."

41. In effect, an appellate tribunal can state that there are in fact violations, as described above, overturn the decision of the Commission, but then simply remand it back to the Commission for further proceeding, in which the Commission will once again be hamstrung by the provisions SB 694 (which by then would be statutory in nature if made effective) that give it its power to begin with and be unable to properly address the issues at hand.

42. Therefore, the language of SB 694 §22C-9-7a, by its construction in a plain reading of the language, violates the U.S. Constitution's Fourteenth Amendment protections against the State depriving any person of property without due process of law.

**<u>COUNT III – Violation of West Virginia Constitution's Article 3, Sections 9 and 10 Provisions Regarding the Taking of Private Property</u>**

43. Plaintiffs incorporate the foregoing paragraphs as though fully set forth herein.

44. West Virginia Constitution Article 3, Section 9 states:

o "Private property shall not be taken or damaged for public use, without just compensation; nor shall the same be taken by any company, incorporated for the purposes of internal improvement, until just compensation shall have been paid, or secured to be paid, to the owner; and when private property shall be taken, or damaged for public use, or for the use of such corporation, the compensation to the owner shall be ascertained in a manner as may be prescribed by general law: *Provided*, that when required by either of the parties, such compensation shall be ascertained by an impartial jury of twelve freeholders."

45. West Virginia Constitution Article 3, Section 10 states:

   o "No person shall be deprived of life, liberty, or property, without due process of law, and judgment of his peers."

46. Taken in concert, the provisions of SB 694 violates both provisions of the West Virginia Constitution stated above as it allows the applicant to determine was is a "good faith offer" and also provides no process to institute the use of a jury to determine first whether such property shall be taken, nor does it secondly provide for a process in which a jury determines what the value of said taking results in just compensation.

47. This is also true with respect to SB 694's stripping of the Commission of powers which encourages efficient extraction from the ground of oil and gas; as currently constituted the Commission has these powers as illustrated by the language of W. Va. Code §22C-9-7(3), (4), and (5), which state:

   o "(3) The commission **shall determine**[2] the area to be included in such spacing order and the acreage to be contained by each drilling unit, the shape thereof, and the minimum distance from the outside boundary of the unit at which a deep well may be drilled thereon. The commission shall consider:

      (A) The surface topography and property lines of the lands underlaid by the pool to be included in such order;

      (B) The plan of deep well spacing then being employed or proposed in such pool for such lands;

      (C) The depth at which production from said pool has been found;

      (D) The nature and character of the producing formation or formations, and whether the substance produced or sought to be produced is gas or oil or both;

      (E) The maximum area which may be drained efficiently and economically by one deep well; and

      (F) Any other available geological or scientific data pertaining to said pool which may be of probative value to the commission in determining the proper deep well drilling units therefor.

---

[2] Emphasized to illustrate in the current code the Commission shall determine unit size, spacing, etc. as compared to the language in SB 694 in which the Commission "shall approve" what an applicant places in front of them so long as application requirements are met.

If the commission determines that drilling units should be established, the commission shall enter an order establishing drilling units of a specified and approximately uniform size and shape for each pool subject to the provisions of this section." [emphasis added]

o "(4) When it is determined that an oil or gas pool underlies an area for which a spacing order is to be entered, the commission shall include in such order all lands determined or believed to be underlaid by such pool and exclude all other lands."

o "(5) No drilling unit established by the commission shall be smaller than the maximum area which can be drained efficiently and economically by one deep well: Provided, That if there is not sufficient evidence from which to determine the area which can be drained efficiently and economically by one deep well, the commission may enter an order establishing temporary drilling units for the orderly development of the pool pending the obtaining of information necessary to determine the ultimate spacing for such pool."

48. The language in sections 4 and 5 quoted above allowed the Commission to ensure a royalty owner's *Just and equitable share of production* is what they received by calling for 1 well per unit in an effective and efficient manner.

49. However, now SB 694 removes the language from §22C-9-7(3), (4), and (5), allowing an operator to drill a well in whatever size unit works for them, leaving aside efficiency guidelines, diluting payments to royalty owners, which results in royalty owners not receiving their *Just and equitable share of production* without any recourse of any kind.

50. Despite SB 694 providing procedural steps for holding hearings and outlining a "standard of review" for the Commission, the steps simply reaffirm the requirements of SB 694 subsection (c), such that it reiterates the only way in which the Commission may reject an application is if it does not meet the requirements of subsection (c); but if those requirements are met, the Commission *shall* *approve* it without any authority for recourse or redress to confront issues that may not be covered by subsection (c) but can otherwise cause harm to individuals in this State based on violations of state and/or federal constitutional, statutory, common law, and/or regulatory provisions, and/or any and all other actions that run afoul of the law. **[See SB 694 §22C-9-7a (e)] [See also, footnote 2].**

51. Furthermore, in the event the appropriate appellate tribunal as outlined by W. Va. Code §22C-

9-11, which references W. Va. Code §29A-5-4, does find violations in the Commission's approval of a horizonal unit application, the tribunal's authority is limited according to W. Va. Code §29A-5-4(g), which states as follows:

- o "(g) The court may affirm the order or decision of the agency or remand the case for further proceedings. It shall reverse, vacate, or modify the order or decision of the agency if the substantial rights of the petitioner or petitioners have been prejudiced because the administrative findings, inferences, conclusions, decision, or order are:

    (1) In violation of constitutional or statutory provisions;

    (2) In excess of the statutory authority or jurisdiction of the agency;

    (3) Made upon unlawful procedures;

    (4) Affected by other error of law;

    (5) Clearly wrong in view of the reliable, probative, and substantial evidence on the whole record; or

    (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

    (h) The judgment of the circuit court or the Intermediate Court of Appeals, whichever is applicable, shall be final unless reversed, vacated, or modified on appeal to the Supreme Court of Appeals of this state in accordance with the provisions of §29A-6-1 of this code."

52. Neither the Commission, nor any appellate tribunal has the authority to refer the matter of just compensation to a jury as required by the provisions of the West Virginia Constitution quoted above.

53. In effect, an appellate tribunal can state that there are in fact violations, as described above, overturn the decision of the Commission, but then simply remand it back to the Commission for further proceeding, in which the Commission will once again be hamstrung by the provisions SB 694 (which by then would be statutory in nature if made effective) that give it its power to begin with and the Commission will once again lack the authority to refer the matter to a Jury; the process would then begin again with an endless loop of an inability to redress the infringement of rights guaranteed by the West Virginia Constitution.

**COUNT IV – Violation of U.S. Constitution's Article I, Section 9 Provision Against Passing Ex Post Facto Law; (also found in West Virginia Constitution's Article 3, Section 4)**

54. Plaintiffs incorporate the foregoing paragraphs as though fully set forth herein.

55. U.S. Constitution Article I, Section 9, Paragraph 3 states "No [omitted] ex post facto Law shall be passed.

56. Likewise, West Virginia Constitution's Article 3, Section 4, states, in part, "No [omitted] ex post facto law, [omitted], shall be passed.

57. SB 694 §22C-9-7a(g)(5)(m) entitled *conflict resolution* states:

   o "After the effective date of this section, all applications requesting unitization for horizontal wells shall be filed pursuant to this section. Deep well horizontal unit applications filed before the effective date of this section shall continue to proceed under and be governed by the provisions of section seven of this article. With respect to horizontal well unit applications filed after the effective date of this section, if this section conflicts with section seven of this article, the provisions of this section shall prevail. When considering an application pursuant to this section, rules regarding deep wells promulgated before the effective date of this section shall not apply."

58. The language of this section of SB 694 allows for a violation of WV Constitution Article 3 Section 4 by providing no limiting language on new horizontal well unitization applications.

59. Consider that the definitions section of §22C-9-2(a)(16) [currently in effect, prior to the effective date of SB 694] defines *Just and equitable share of production* as follows: "as to each person, an amount of oil or gas or both substantially equal to the amount of recoverable oil and gas in that part of a pool underlying the person's tract or tracts."

60. SB 694 defines *just and equitable share of production* as follows: "as to each person, an amount of oil or gas or both substantially equal to the amount of recoverable oil and gas in that part of a pool, *unit, or unconventional* reservoir underlying the person's tract or tracts within a unit." [emphasis added].

61. The new definition of *Just and equitable share of production* in SB 694 is to include "unit, or

unconventional reservoir underlying the person's tract or tracts within a unit." By making this addition, it changes a royalty owner's interest from being a proportion of the oil and gas extracted from under its tract, to a percentage of interest that one's tract makes up in a larger unit.

62. If followed properly by Operators, it limits the amount of land it can maintain under lease without drilling additional wells to extract oil and/or gas from under one's tract directly to result in payment that maintains a lease into its secondary term. (i.e. if it drills under 20 acres of land, it is to pay based on drilling under 20 acres of land by definition.)

63. The new definition allows an operator to combined up to 640 acres (or possibly more) into one unit **[see SB 694 §22C-9-7a (f)(1)(A)]**, drill under 20 acres of that unit, extract the oil and/or gas from under that 20 acres, and spread the payments around amongst all interest holders throughout the entire unit in order to push a lease into its secondary term; resulting in the holding of 640 acres of oil and/or gas interest while producing only 20 acres worth of oil and/or gas.

64. Therefore, Operators can then take wells that are already producing under the old definition and create a "new" unit, which is encompassed by that well, and apply for a new unit designation so that the Operator can then allege that a new unit has been created and therefore the language in SB 694 applies, which then allows the Operator to spread payments out over 640 acres in order to trigger secondary terms under tracts of land that should be governed under the old law because they were technical formed using the old application process; and were acquired via leases signed while the current definitions were (are) in effect.

65. Ergo, a new law then applies, after the fact, to tracts of land already in production, in violation of the West Virginia Constitution's prohibition against the passing of ex post facto laws; and

not only applies after the fact but encourages operators to engage in such behavior, violating both the letter and spirit of the Constitutional provision in question.

### COUNT IV – Violation of U.S. Antitrust Laws

66. Plaintiffs incorporate the foregoing paragraphs as though fully set forth herein.

67. The Sherman Antitrust Act begins in 15 U.S.C. §1, which states, in part, "Every contract, combination in the form of trust otherwise, or conspiracy, in restraint of trade of commerce among the several States, or with foreign nations, is declared to be illegal."

68. In determining whether a certain set of circumstances run afoul of Antitrust provisions, the United States Supreme Court has articulated two "complementary categories of Antitrust analysis" Per Se or Rule of Reason analysis should be applied. *(National Society of Professional Engineers v. United States, 435 U.S. 679 (1978)).*

69. "In the [per se] category are agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality—they are illegal per se." *(id. at 692.)*

70. The Rule of Reason standard is as follows: "Under this rule the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." (*Id. at 692, quoting Continental T.V., Inc., 433 U.S. 49.*).

71. The argument in the case at bar is not whether joint operating agreements in the oil and gas industry in general run afoul of Antitrust laws, but whether the language contained within SB 694 regarding joint operating agreements is tantamount to a violation of antitrust laws in and of itself under either or both of the tests described above.

72. The pertinent language of SB 694 is 22C-9-7a(c)(2)(A) and (B), which states as follows:

- o "(2) Before filing an application under this section, an applicant must have:

  (A) With respect to the royalty interest, for shallow horizontal wells and deep horizontal wells, obtained by ownership, lease, lease amendment, assignment, farmout, compliance with §37B-1-1, et seq. of this code with respect to unknown or unlocatable interest owners defined in §37B-1-3 of this code only, contract or other agreement the right, consent or agreement to pool or unitize the acreage to be included in the horizontal well unit from executory interest royalty owners of 75 percent or more of the net acreage in the target formation proposed to be included in the horizontal well unit, as provided and determined in subdivision (3) of this subsection; and

  (B) With respect to the operator interest:

  (i) For shallow horizontal wells, obtained by ownership, lease, lease amendment, assignment, farmout, contract, or other agreement, the right, consent or agreement to pool or unitize as to 55 percent or more of the net acreage in the target formation proposed to be included in the horizontal well unit owned, leased, or operated by operators and the applicant, collectively, by ownership, lease, farmout, assignment, contract or other agreement, as provided and determined in subdivision (3) of this subsection; or

  (ii) For deep horizontal wells, obtained by ownership, lease, lease amendment, assignment, farmout, compliance with §37B-1-1, et seq. of this code with respect to unknown or unlocatable interest owners defined in §37B-1-3 of this code only, contract or other agreement the right, consent or agreement to develop the acreage to be included in the horizontal well unit from executory interest royalty owners of 55 percent or more of the net acreage in the target formation proposed to be included in the horizontal well unit, as provided and determined in subdivision (3) of this subsection;"

- Further, the writing above should be read in concert with SB 694 §22C-9-7a (f) (9) which states as follows:

  - o "An operator may elect to consent to and participate in a horizontal well unit after an application is filed. Subject to subdivision (7) of this subsection, when the commission issues a horizontal well unit order pursuant to this section, the commission shall allow each nonconsenting operator, who does not elect to participate in the risk and cost of drilling in the horizontal well unit through a voluntary agreement with the applicant, to participate in the drilling in the horizontal well unit on a carried basis on terms and conditions which, if not agreed upon, shall be consistent with the terms and conditions contained in the proposed joint operating agreement submitted by the applicant in accordance with §22C-9-7a(d)(1)(M) of this code: Provided, that the commission determines that the proposed terms and conditions of the joint operating agreement are consistent with terms typically found in other similarly situated, arm's length joint operating agreements within the horizontal well unit that were entered into by the applicant for the same target formation prior to the filing of the application for the horizontal well unit.

73. The language from §9 above encourages one-sided agreements that run afoul of the Antitrust laws by violating both the Per se test and the Rule of Reason on its face.

74. The legislature first encourages agreements that fail the Per Se test because it requires joint operating agreements be consistent with terms for joint operating agreements that cannot possibly exist. In essence the non-controlling operator either agrees to whatever the controlling operator considers to be favorable terms, or no such agreement can go into effect at all, yielding total monopolistic control over a horizontal unit by the controlling operator.

75. Such a situation falls into the "category of agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality—they are illegal per se." (id. at *692*.)

76. In the other instance, in which the non-controlling interest holder does agree to a joint operating agreement, that is in and of itself anti-competition because the controlling operator has all of the leverage once control is gained in the minimums required by SB 694's language.

77. This undue leverage if also reiterated in another section of SB 694—mentioned above in a different context— being SB 694 §22C-9-7a (c)(2)(C)(ii), which states:

   o "Before filing an application under this section, an applicant must have:

      (ii) Made good faith offers to participate or consent or agree to the proposed horizontal well unit, and has negotiated in good faith with, all known and locatable operators who have not previously agreed to participate or consent or agree to development of the acreage to be included in a proposed horizontal well unit.

78. This section provides no definition of "good faith." Ergo, the controlling operator defines what that means, and can ultimately force a non-controlling operator into what the controlling operator deems to be a fair agreement on its own terms as illustrated above (i.e. anti-competition on its face).

79. All instances discourage multiple operators from attempting to lease within the same area, which tends to drive up compensation for mineral owners; instead, it encourages operators dividing area so that there is one operator per area as a means of deconflicting with one

another.

80. The concept of deconfliction in a market is the very essence of what Antitrust laws were designed to discourage because it is bad for consumers across the board. (i.e. even if one makes a determination that they do not violate the Per Se test, they do indeed Violate the Rule of Reason test as one considers the cause and effect of such agreements on competition, or the lack thereof).

## WAIVER OF BOND

81. Plaintiffs incorporate the foregoing paragraphs as though fully set forth herein.

82. Plaintiffs seek waiver of bond as required by Federal Rule of Civil Procedure 65(c) because "where the district court determines that the risk of harm [to the enjoined party] is remote, or that the circumstances otherwise warrant it, the court may fix the amount of the bond accordingly. In some circumstances, a nominal bond may suffice" [B.P.J. Et al. v. West Virginia Board of Education (Dist. Court Southern Dist. Of W.Va. 2:21-cv-00316) quoting Hoechst Diafoil Co. v. Nan Ya Plastics Corp. 174 F.3d 411, 421 n.3 (4th Cir. 1999).

83. Further, "This bond can even be waived entirely when the defendant would not suffer any harm from the injunction" B.P.J. Et al. v. West Virginia Board of Education (Dist. Court Southern Dist. Of W.V. 2:21-cv-00316) quoting Citizens for a Responsible Curriculum v. Montgomery Cnty. Pub. Sch., No. Civ A. AW-05-1994., 2005 WL 1075634 at 12 (D. Md. May 5, 2005).

84. In the instant case, nominal bond or full waiver of bond is appropriate because Defendant will not be harmed by such an injunction.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request this Honorable Court enter an order and judgment as follows:

A.  Declaring that the provisions of SB 694 as discussed above violate Plaintiffs' rights under the U.S. Constitution's Fifth Amendment protection against the taking of private property without just compensation;

B.  Declaring that provisions of SB 694 as discussed above violate Plaintiffs' rights under the U.S. Constitution's Fifth and Fourteenth Amendment protections against the State depriving any person of property without due process of law;

C.  Declaring that provisions of SB 694 as discussed above violate Plaintiffs' rights under the West Virginia Constitution's Article 3, Sections 9 and 10 provisions regarding the taking of private property without just compensation, without due process of law, and without judgment of one's peers;

D.  Declaring that provisions of SB 694 as discussed above violate U.S. Antitrust Laws.

E.  Preliminarily and permanently enjoining SB 694 from becoming effective as scheduled on June 7, 2022. Or, in the alternative, preliminarily and permanently enjoining Defendant, its officials, agents, employees, assigns, and all persons acting in concert or participating with Defendant from enforcing SB 694;

F.  Waiving the requirement for the posting of a bond as security for entry of temporary or preliminary injunctive relief;

G.   Award Plaintiffs costs, expenses, reasonable attorneys' fees and any and all further relief this Honorable Court deems just and proper.

Respectfully Submitted,

Scott Sonda and Brian Corwin

By:

/s/ *J. Anthony Edmond Jr.*
_____

J. Anthony Edmond Jr. Esq. (WVSB #14162)
Michael B. Baum, Esq. (WVSB #12310)
EDMOND & BAUM, PLLC
1300 Market Street, Suite 102
Wheeling, WV 26003
P: 304.810.3201
F: 304.212.0473
attorneys@edmondbaumpllc.com
*Counsel for the Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA
WHEELING DIVISION**

**SCOTT SONDA and
BRIAN CORWIN**

       *Plaintiffs,*

   **VS.**                                       **CIVIL ACTION NO.**

                                               **HON.**

                                             **COMPLAINT**

**JAMES C. JUSTICE, II
GOVERNOR OF THE STATE
OF WEST VIRGINIA**

       *Defendant.*

<u>**CERTIFICATE OF SERVICE**</u>

I, J. Anthony Edmond Jr., do hereby certify that on this  13  day of  May , 20 22 , I electronically filed a true and exact copy of the forgoing Complaint with the Clerk of Court and all parties using the CM/ECF System.

                                               */s/ J. Anthony Edmond Jr.*

                                                J. Anthony Edmond, Jr., Esq.